UNITED STATES DISTRICT COURT

Northern District of California

ROBERT EWING,

             Plaintiff,

    v.

UNITED STATES OF AMERICA,

             Defendant.

_____/

No. C 07-01229 MEJ

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

## I.   INTRODUCTION

Plaintiff Robert Ewing initiated this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), against Defendants United States and the United States Postal Service (collectively, "the United States") on March 1, 2007 (Dkt. #1, "Complaint").  Mr. Ewing alleges that on December 8, 2004, he was working as a truck driver for DM Transportation and was hauling mail as an independent contractor for the U.S. Postal Service at the Clark Street facility in Eureka, California.  (Compl. ¶3.)  According to Mr. Ewing, while he was standing in the truck bed and was in the process of unloading mail into a metal cage at the rear of the truck, Postal Service employee Mike Hansen negligently pulled the metal cage from the back of the truck.  (Compl. ¶3.)  As a result, Mr. Ewing alleges he fell from the back of the truck approximately four feet to the ground, hitting the lift, and ultimately shattering his right elbow and sustaining other physical injuries.  (Compl. ¶4.)  Mr. Ewing avers that because of the fall, he suffers from a permanent disability, lost range of motion, and extreme pain and suffering.  (Compl. ¶4.)  He also claims that he has incurred and will continue to incur medical expenses and lost wages.  (Compl. ¶4.)  In this action, he seeks a finding of liability against the United States and an award of past and future lost wages, past and future medical expenses, and general damages.  (Compl. at 2.)

On September 15, 16, 17, 18, and 30, 2008, the parties tried this case to the Court.  After

carefully considering the parties' arguments and thoroughly reviewing and weighing all of the evidence, including witness testimony and medical evidence, the Court now enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II.   FINDINGS OF FACT

**A.      Background Facts**

**1.      Mr. Ewing's Background**

1.    Mr. Ewing was born February 3, 1969, is married, and has two minor children.  (9/15 Tr. 54:18-23.)

2.    Mr. Ewing grew up and lives in Scotia, California, which is located about 25 miles south of Eureka, California, the site of the subject incident.  (9/15 Tr. 53:1-22.)

3.    In 1987, Mr. Ewing received his diploma from Fortuna High School in Fortuna, California. (9/15 Tr. 53:23-54:9.)

4.    From 1987 to 2002, Mr. Ewing held a series of jobs for over a dozen employers before he began working as a truck driver.  (9/15 Tr. 134:18-24.)  He worked for Pacific Lumber Company, Pacific Choice Seafood, Denny's, and Marie Callender's.  (Def. Ex. A1.)  Mr. Ewing also worked for the California Conservation Corps for two years in Southern California and the Lake Tahoe area.  (9/15 Tr. 134:25-135:11.)

5.    Starting in approximately April 2002, Mr. Ewing worked for three different Postal Service contractors as a truck driver, all within a 20 month period.  (9/15 Tr 90:19-91:1, 135:12-25.) Mr. Ewing first worked as a truck driver for Lorico for approximately three months.  (9/15 Tr. 59:23-24.)  Next, he worked as a truck driver for Crosswhite for approximately three months.  (9/17 Tr. 30:23-31:6.)  Third, he worked as a truck driver for DM Transportation for approximately 14 months.  (9/15 Tr. 110:22-111:5.)

6.    On December 8, 2004 - the day of the incident - Mr. Ewing was working for DM Transportation, a contract mail hauler based in Riverton, Utah.  (9/15 Tr. 97:18-21.)  At that time, DM was under a four year contract with the United States Postal Service for mail

2

delivery in the Eureka area.  (9/17 Tr. 31:10-17.)

7.    Mr. Ewing holds a California Class C diver's license.  (9/15 Tr. 136:5-7.)  A Class C license is a standard driver's license.  (9/15 Tr. 136:8-9.)  He did not need any other license to work for DM or any of the Postal Service contractors he worked for prior to DM.  (9/15 Tr. 60:22-61:6, 136:10-12.)

8.    Before his injury on December 8, 2004, Mr. Ewing had begun the process of getting a commercial driver's license by passing a Department of Motor Vehicles physical examination, which was a prerequisite to obtaining the commercial license.  (9/15 Tr. 61:7-16, 91:2-10; Def. Ex. A34 at 17:5-18.)

9.    Mr. Ewing was 6 feet, 3 inches tall on the day of the incident.  (9/15 Tr. 136:13-14.)

10.   Two months prior to the incident, in October 2004, Mr. Ewing weighed 330 pounds.  (9/15 Tr. 137:7-21.)  At his deposition in July 2007, Mr. Ewing testified that he weighed approximately 340 pounds.  (9/15 Tr. 136:17-19.)  In May 2008, according to his medical records, Mr. Ewing weighed 332 pounds.  (9/15 Tr. 137:22-138:7.)

## 2.    The Clark Street Postal Facility

11.   The Clark Street Postal Facility is located in Eureka, California, and is bordered by Clark Street to the north and Summer Street to the east.  (9/18 Tr. 9:8-13.)  The facility's loading dock is on its eastern side. ( 9/18 Tr. 9:8-13.)

12.   The loading dock area has six bays for trucks to access to deliver or pick up mail.  (9/18 Tr. 9:14-22.)  Three bays have hydraulic lifts.  (9/18 Tr. 9:14-18.)  Trucks access the loading dock from Summer Street.  (9/18 Tr. 9:23-10:3; Def. Ex. A30 - DSC_0264, 265, 266, and 267.)

13.   The three hydraulic lifts are in the bay areas numbered one, two and three.  Bay number one is the most northerly, bay number three is the farthest to the south, and bay number two is between bays one and three.  (9/18 Tr. 11:13-12:4.)

3

14. Each of the three bays with hydraulic lifts has flaps at the end of the lift; when the lift is in the lowered position, the flaps are vertically oriented.  (9/18 Tr. 14:17-15:3; Def. Ex. A30 - DSC_0257, MOV-OOF, MOV-004, MOV-010.)

15. Lifts one and three are substantially similar to each other.  (9/18 Tr. 22:6-15.)  Lift two is different from lifts one and three in two respects: its configuration on the dock platform and the dimensions of its lift flaps.  (9/18 Tr. 20:6-22:5.)

16. The lift flaps at lift number two are taller than the lift flaps at lift number three when the flaps are in their vertical orientation.  (9/18 Tr. 15:14-25, 23:22-24:24:2, 49:13-18; Def. Ex. A30 - DSC_0257, 270, 277.)  The lift flaps at lift number two are 36 inches long.  (9/18 Tr. 20:11-13.)  The lift flaps at lift number three are 22.5 inches long.  (9/18 Tr. 19:5-17; Def. Ex. A30 - DSC_0135.)  Therefore, when vertically oriented, the flaps at lift two are 13 ½ inches taller than the flaps at lift three.

17. Lift number two is offset from the edge of the dock by a total of 24 inches; however, lift number three is not offset but rather extends all the way to the edge of the loading dock.  (9/18 Tr. 21:6-17.)  If a truck is backed up all the way until it makes contact with the loading dock bumper structure, at lift number 2, the most rearward edge of the truck would be 24 inches from the edge of the lift flap at lift number two.  (21:18-22:5; Def. Ex. A30 - DSC_0270, 277.)

18. The three lift platforms have similar length and width dimensions.  (9/15 Tr. 41:20-22.)  The lift platforms are 102 inches (8 feet, six inches) long.  (9/18 Tr. 16:21-17:12.)  The lift platforms are 78 inches (6 feet, six inches) wide when measured from edge to edge.  (9/18 Tr. 17:13-20.)  The lift platforms' width inside the two hand railings is 64 inches (5 feet, four inches).  (9/18 Tr. 18:1-8.)

**B.  The December 8, 2004 Incident**

**1.  Robert Ewing's Version of the Incident.**

19. The incident giving rise to Mr. Ewing's claim occurred on December 8, 2004, when Mr.

4

1    Ewing fell off the back of his co-worker Mike Mora's truck at the loading dock area of the

2    Clark Street Postal facility.

3    20.    At the time of the incident, Mr. Ewing was employed by DM Transportation as a truck driver

4          and worked a full-time, split-shift. (9/15 Tr. 60:14-16, 99:9-11.) He was gone from his

5          home for over 14 hours and was paid for six of those hours. (9/15 Tr. 100:1-23.) He worked

6          six days a week every other week. (9/15 Tr. 99:20-23.) On the other weeks, he worked 30

7          hours, or five working days. (9/15 Tr. 99:24-25.) His total hourly compensation was $19.95.

8          (9/15 Tr. 138:8-10.) He did not receive benefits in addition to this hourly pay rate; instead,

9          DM paid Mr. Ewing approximately $2.00 for benefits, which was counted within the hourly

10         rate of $19.95. (9/15 Tr. 138:11-20.) Mr. Ewing chose not to use any of those funds to pay

11         for benefits. (9/15 Tr. 138:11-20.)

12   21.    Mr. Ewing drove the "Long South" route. (9/15 Tr. 61:22-62:5.) Mr. Ewing's usual

13         workday started at 4:30 a.m., when he drove his truck from his home in Scotia, California, to

14         the Clark Street facility in Eureka, where he began his shift at 5:15 a.m. (9/15 Tr. 100:1-11.)

15         He then drove his truck south to Leggett, dropping off mail for delivery at post offices along

16         his route and arriving in Leggett at 8:30 a.m. (9/15 Tr. 100:12-14.) Mr. Ewing then had an

17         eight-hour layover in Leggett. (9/15 Tr. 100:15-16.) During his layover, which was not

18         compensated, Mr. Ewing would either stay with his truck or visit with people he met or knew

19         in Leggett. (9/15 Tr. 100:17-101:1.) His scheduled departure from Leggett was 4:30 p.m.

20         (9/15 Tr. 101:2-3.) He then drove his truck north to the Clark Street facility, retracing his

21         route to pick up mail for processing at the Clark Street facility. (9/15 Tr. 59:1-4; 9/17 Tr.

22         35:23-36:2.) Mr. Ewing's scheduled arrival time at the Clark Street facility was around 7:00

23         p.m. (9/15 Tr. 101:4-102:13; 9/17 Tr. 37:6-37:38:3.)

24

25   22.    On December 8, 2004, Mr. Ewing followed his usual workday routine. (9/15 Tr. 102:19-

26         103:2.) He drove the Long South route, laid over in Leggett for eight hours, and then drove

27         back to Eureka-Clark Street to unload the mail from his truck. (9/15 Tr. 102:19-103:2.)

28

UNITED STATES DISTRICT COURT
For the Northern District of California

23. The incident occurred during the busy Christmas season, which is the busiest time of year at the Clark Street facility. (9/15 Tr. 39:1-10.)

24. Mr. Ewing confirmed that before the incident, he unloaded his truck, moved his truck out of the way, drove Mr. Mora's truck from a nearby alley to the loading dock, and then worked unloading Mr. Mora's truck, all of which took an estimated 20-30 minutes and occurred before the incident. (9/15 Tr. 103:5-22.) Mr. Ewing testified that the time of his fall was approximately 6:45 p.m. (9/15 Tr. 102:14-18.) Other testimony confirmed that the ambulance was dispatched at 6:53 p.m. that evening. (9/30 Tr. 9:23-10:1.)

25. Therefore, the Court finds that on December 8, 2004, Mr. Ewing arrived at the Clark Street facility between 6:15 and 6:20 p.m.

26. Mr. Ewing's scheduled arrival time at the Clark Street facility at the end of the Long South route was around 7:00 p.m. - after the Short South delivery had arrived. (9/15 Tr. 38:1-12, 102:9-13, 104:7-10; 9/17 37:24-38:3.)

27. Postal workers in the dock area, including Michael Hansen, had complained about Mr. Ewing's early arrival at the facility on other occasions. At trial, Mr. Ewing denied he was told of any such complaints (9/15 Tr. 104:11-15), but then he was impeached with his deposition testimony to the contrary (104:16-105:18).

28. In addition to Mr. Ewing, Mike Mora was also employed by DM in December 2004 as a truck driver and was Mr. Ewing's supervisor. (9/17 Tr. 6:2-9.) Mr. Mora drove the "Short South" route, which ran from Eureka to Garberville. (9/17 Tr. 4:21-25.) Mr. Mora's truck contained "bed load" mail, *i.e.*, loose parcels, flats, and bags of mail picked up from rural post offices along his route which were not in containers, but stacked on the bed of his truck. (9/17 Tr. 4:21-25, 12:19-24, 13:2-4, 65:3-7; 9/17 Tr. 4:21-25, 8:22-24.) The delivery from the Short South route, which Mr. Mora delivered, was scheduled to arrive at the Clark Street facility each day before the delivery from the Long South route, which Mr. Ewing delivered. (9/15 Tr. 38:1-12; 9/17 Tr. 37:2-38:5.) Mr. Mora normally arrived at the Clerk Street facility

1    between 6:00 and 6:10 p.m.  (9/17 Tr. 13:15-17; 9/15 Tr. 38:1-5.)

2    29.    Mr. Mora's testimony was that he was scheduled to arrive at 6:10 p.m., but due to the heavy

3           volume of mail during the Christmas season, he arrived sometime between 6:20 and 6:25

4           p.m.  (9/17 Tr. 13:18-21, 37:24-38:3, 40:4-13, 41:18-24.)

5    30.    When Mr. Ewing arrived at Clark Street facility on December 8, Mr. Mora had not yet

6           arrived.  (9/15 Tr. 106:1-3.)

7

8    31.    When he arrived at the Clark Street facility, Mr. Ewing backed his truck up to the loading

9           dock on the east side of the facility, adjacent to the street, and proceeded to unload his truck.

10          (9/15 Tr. 106:4-6.)  To do this, he completed a series of steps by himself: he lifted the back

11          of his truck up to reveal his load, he raised the hydraulic lift on the dock to the elevation of

12          the bed of his truck, he rolled four cages of mail off, and he lowered the hydraulic lift with

13          the four cages of mail.  (9/15 Tr. 106:4-16.)  He then waited for a Postal Service employee,

14          called a mail handler, to take the four cages of mail off the hydraulic lift.  (9/15 Tr. 106:17-

15          21.)  Mr. Ewing used the hydraulic lift to unload his truck on a near daily basis during his

16          employment with DM.  (9/15 Tr. 108:3-6.)

17   32.    When Mr. Ewing was done unloading his truck, he testified that he then backed Mr. Mora's

18          truck up to the same dock he had used to unload his truck, which he said was dock number

19          three.  (9/15 Tr. 68:8-69:25, 106:22-25, 157:20-22.)

20   33.    After backing Mr. Mora's truck up to the loading dock, Mr. Ewing got out of the driver's

21          side door and walked alongside the truck.  (9/15 Tr. 107:1-4.)  He saw four empty mail cages

22          in the area.  (9/15 Tr. 107:5-6.)  These were the same four empty cages that Mr. Ewing had

23          placed in that location when he removed them from his truck.  (9/15 Tr. 107:7-9.)

24   34.    According to Mr. Ewing, he told the mail handler at the Clark Street facility, Postal

25          employee Mike Hansen, to leave the four empty cages alone, and that he and Mr. Mora were

26          going to load mail into the four cages.  (9/15 Tr. 107:10-16.)

27

28   35.    After telling Mike Hansen that he needed the four empty cages to unload mail, Mr. Ewing

7

opened the back door of Mr. Mora's truck, got inside the truck, and started unloading mail. (9/15 Tr. 108:7-10.)

36.     According to Mr. Ewing, the four cages were on the hydraulic lift, in a side-by-side configuration, in two rows of two cages, with no space in between the four cages.  (9/15 Tr. 108:11-13, 108:23-109:1; Def. Ex. A52 [Ewing Depo. 91:1-14, 93:14-18].)

37.     Mr. Ewing began to unload the mail into one of the cages. (9/15 Tr. 108:7-10, 14-16.)  The cage Mr. Ewing was loading into was on the lift, which was in the lowered position.  (9/15 Tr. 108:17-19.)  Mr. Ewing placed mail from the bed of Mr. Mora's truck into the cage directly, from the higher elevation of the truck bed.  (9/15 Tr. 108:20-22.)

38.     Mr. Mora and Mr. Ewing worked together to unload Mr. Mora's truck for about 5-10 minutes.  (9/15 Tr. 103:20-23.)  Mr. Ewing loaded packages into the cage closest to the bed of the truck and to his right side as he faced the cages.  (9/15 Tr. 109:11-16.)

39.     According to Mr. Ewing, before he fell, the formation of the four cages on the lift did not change from the two-by-two formation with no room in between the cages.  (9/15 Tr. 114:14-25; Def. Ex. A52 [Ewing Depo 96:7-19].)

40.     Mr. Ewing was not paying attention to whether anyone else was around when he and Mr. Mora worked side by side to unload Mr. Mora's truck, and he and Mr. Mora were intermittently talking while they were unloading the mail.  (9/15 Tr. 109:20-23, 110:2-6.)

41.     Mr. Ewing usually drove his truck home to Scotia, which normally took 30-45 minutes. (9/15 Tr. 110:7-11.)  He usually got home at 7:15-7:30 p.m.  (9/15 Tr. 110:12-13.)

42.     Stopping to help Mr. Mora by unloading Mr. Mora's truck was unusual for Mr. Ewing; it had only happened 1-2 times in 14 months.  9/15 Tr. 110:14-111:5.  Because he assisted Mr. Mora in unloading his mail on December 8, 2004, Mr. Ewing was delayed from getting home at his usual time.  (9/15 Tr. 112:1.)

43.     In the thirty seconds before the incident, Mr. Ewing had picked up a heavy, 40-50 pound

UNITED STATES DISTRICT COURT
For the Northern District of California

8

**UNITED STATES DISTRICT COURT**
For the Northern District of California

package from the bed of Mr. Mora's truck and leaned over the cage over the cage to place the package inside. (9/15 Tr. 112:2-9.) He was placing the package into the first cage, nearest to the bed of the truck, on his right – the same cage he had been loading for 5-10 minutes. (9/15 Tr. 112:10-12.)

44.    Mr. Ewing was approximately 29 inches above the top of the cage. The elevation of the top of the cage was 94-95 inches. (9/18 Tr. 31:2-4, 28:12-15.) Mr. Ewing stood at an elevation of 123 inches, using his height of 6'3" and the minimum truck bed elevation. (9/17 Tr. 38:12-39:25 (truck bed was 48-52")).

45.    According to Mr. Ewing, in order to unload the package, he bent forward at the waist, but only "slightly." (9/15 Tr. 112:15-17.) His feet were still on the bed of the truck, and his legs did not make contact with the side of the cage. (9/15 Tr. 112:18-25.) This created a gap between his lower torso and legs and the side of the mail cage, which Mr. Ewing estimated was about 6-12 inches. (9/15 Tr. 113:1-3.)

46.    When he leaned forward, Mr. Ewing's chest was in contact with the outside wall of the cage, about six inches below the top rim of the cage. (9/15 Tr. 113:11-20.) His head, neck and shoulders were extended forward over the rim of the mail cage. (9/15 Tr. 113:21-23.) His arms up to a point close to halfway up forearms were actually inside the cage, so that the underside of his forearms were in contact with the upper rim of the mail cage at the same time that his chest was in contact with the cage. (9/15 Tr. 113:4-10.)

47.    When he became aware that the cage was moving, Mr. Ewing was looking down into the cage. (9/15 Tr. 114:4-7.) His forearms and chest were still in contact with the cage when it started to move. (9/15 Tr. 114:8-10.) The cage that moved was the same one he had been loading into. (9/15 Tr. 114:11-13.)

48.    At trial, Mr. Ewing conceded that it was not physically possible for Mr. Hansen to pull the cage closest to the truck that Mr. Ewing was loading a 40 pound package into, if as Mr. Ewing testified, there were four cages on the lift. (9/15 Tr. 115:1-116:2.)

9

49.     Mr. Ewing did not see Mr. Hansen just before he became aware he was going to fall or during the fall.  (Def. Ex. A52 [Ewing Depo. 97:22-98:11, 98:13-99:8].)

50.     Mr. Mora was in the rear bed of his truck at the time Mr. Ewing fell.  (9/15 Tr. 116:3-7.)  He was "a couple of feet" behind Mr. Ewing, picking up more packages to unload.  (9/15 Tr. 116:8-117:1; Def. Ex. A52 [Ewing Depo. 115:23-116:3, 116:15-117:9].)

51.     Mr. Ewing fell onto the lift.  He said he fell head first and stuck his hands out, and that his waist contacted the raised metal flap at the edge of the hydraulic lift.  (9/15 Tr. 96:10-11, 118:6-11; Def. Ex. A52 [Ewing Depo. 120:11-123:11].)

52.     Mr. Ewing fell and made contact with the flap when it was in the vertical position, and he testified his waist was balanced on the top edge of the metal flap.  (9/15 Tr. 96:21-24.)  He made an "X" on a photograph of a raised lift flap to indicate where his waist made contact with the flap in the incident.  (9/15 Tr. 125:7-126:21, Def. Ex. A7.)

53.     Mr. Ewing testified that after the fall, his legs ended up between the bumper and the bed of the truck, with his feet under the bed of the truck.  (9/15 Tr. 96:13-18, 118:12-23; Def. Ex. A52 [Ewing depo 117:20-118:24].)

54.     In this position, Mr. Ewing testified that he was dangling in the air and bouncing on the metal flap.  (9/15 Tr. 118:24-119:21; Def. Ex. A52 [Ewing Depo 117:20-118:24].)

55.     Mr. Ewing testified that he could not have tripped over the top edge of the raised lift flap because it did not extend above the bed of the truck, but rather was only halfway up to the bed, a distance he demonstrated as approximately one foot.  (9/15 Tr. 119:22-120:12.)

**2.      Mike Hansen's Testimony Regarding The Incident.**

56.     Postal worker Mike Hansen has been a mail handler at the Clark Street facility since the mid-1990's.  (9/15 Tr. 6:1-14.)

57.     On the day of the incident, Mr. Hansen knew that Mr. Ewing and Mr. Mora were both standing in the back of Mr. Mora's truck and talking.  (9/15 Tr. 16:19-17:10.)

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

58.  According to Mr. Hansen, there were two cages on the lift.  (9/15 Tr. 15:9-12, 25:7-12.)

59.  Mr. Hansen moved a cage off the lift because it was full and therefore ready to be pulled off the lift.  (9/15 Tr. 17:15-18:3.)

60.  Before he moved the cage, as he moved back and forth on the dock breaking out mail, Mr. Hansen visually checked the cage and saw that it was full.  (9/15 Tr. 18:21-19:6, 25:16-21, 42:2-15.)

61.  Expert testimony confirmed that if two cages were oriented in a row on the lift, there would be six inches of aggregate clearance within the two side railings of the lift.  (9/18 Tr. 33:2-34:19.)

62.  Mr. Hansen recalled hearing a loud crash a few seconds after he moved this cage, which was Mr. Ewing falling on the lift.  (9/15 Tr. 22:5-14.)

63.  Mr. Hansen had pulled the cage off the lift by the time he heard the loud crash.  (9/15 Tr. 22:5-12, 41:12-19, 47:1-4, 49:2-24.)

64.  Mr. Hansen did not see Mr. Ewing fall.  (9/15 Tr. 22:15-16.)

65.  Mr. Hansen did not feel anything being placed into the cage as he pulled it away.  (9/15 Tr. 26:6-20, 27:19-24.)

66.  Mr. Hansen did not feel anything in contact with, providing resistance to, or pushing against the cage as he pulled it away.  (9/15 Tr. 26:6-20, 27:19-28:8, 28:20-23, 29:2-5.)

67.  Mr. Hansen did not hear any package dropping into or being placed into the cage as he pulled it away.  (9/15 Tr. 26:6-20, 27:19-24.)

68.  Mr. Hansen testified that he did not give any verbal warning to contract truck drivers unloading mail before moving a cage off the lowered lift and that no such verbal warning was expected by the truck drivers.  (9/15 Tr. 43:25-44:17.)

   **3.      Mike Mora's Testimony About The Incident and Related Issues.**

69.  Mr. Mora testified that he drove his truck on the Short South route on December 8, 2004.

11

(9/17 Tr. 13:15-21.)  He left his truck near the dock, but did not park it, and then went inside to take the secured mail to the registry cage.  (9/17 Tr. 16:4-11.)  When Mr. Mora returned from the registry cage, Mr. Ewing had backed Mr. Mora's truck up to the loading dock and was already unloading mail from Mr. Mora's truck into one of the cages.  (9/17 Tr. 16:12-13, 19:1-4.)

70.  Mr. Mora testified that his truck was backed up to loading dock number three.  (9/17 Tr. 14:24-15:1, 17:1-3, 17:10-15, 18:1-14, 25:1-2.)

71.  After he returned from the registry cage, Mr. Mora climbed into the bed of his truck and assisted Mr. Ewing with unloading this mail.  (9/17 Tr. 5-6.)

72.  On direct examination, Mr. Mora stated that postal employee Mike Hansen pulled a cage off the lift as Mr. Ewing was loading a package into the cage.  (9/17 Tr. 20:11-21.)  Mr. Mora claimed to be in a position to see what was happening because the width of the truck bed was only 8 feet.  (9/17 Tr. 20:22-25.)  He said he saw Mr. Ewing pick up a package and set it over the cage before the cage was pulled away.  (9/17 Tr. 21:1-6.)  Mr. Mora said there were only two cages on the lift, side by side abutting the truck bed.  (9/17 Tr. 22:1-25.)

73.  Mr. Mora's testimony was equivocal regarding the amount of packages that had been unloaded into the cages.  On direct, he said the cage was not full "clear to the top" and there was room for more packages.  (9/17 Tr. 26:1-11.  On cross, his deposition was read and in that testimony Mr. Mora stated that both cages on the lift were full.  (9/17 Tr. 46:21-47:9.)

74.  On cross examination, Mr. Mora was impeached on several material aspects of his testimony.

    a.  The configuration of the cages: On direct, and in response to the Court's questions, Mr. Mora testified there were two cages on the lift, side by side, next to the back of the truck.  (9/17 Tr. 18:17-20.)  At his deposition, however, Mr. Mora testified there were two cages, with the one closest to the truck being almost full but the cage furthest from the truck being full.  (9/17 Tr. 46:2-49:17 [Mora Depo. 71-73.])  Mr. Ewing's attorney asked for the reading of additional testimony from pages 72-73 of

12

Mr. Mora's deposition, in which Mr. Mora clarified that when the incident occurred he was in the back of the truck bed carrying a package. (9/17 Tr. 49:6-17.) Thereafter, Mr. Mora's subsequent deposition testimony was read, in which he testified that Mr. Ewing was loading the package into the cage "closest" to the truck, including the following question and answer:

> "Q: Did you - did you - were you able to see which of the two cages Robert was putting the package into?
>
> A: The closest one to the truck."

(9/17 Tr. 49:18-50:6 [Mora Depo. 75].)

b.  Whether Mr. Mora was looking straight down at a package just before the incident: At trial, Mr. Mora said that when he picked up a package in the truck, just before the incident happened, he was not looking straight down at the package, but at his deposition, Mr. Mora testified he could not have been looking at Mr. Ewing if he was looking down and picking up a package. (9/17 Tr. 50:7-51:2 [Mora Depo. 78].)

c.  Whether Mr. Mora was behind Mr. Ewing when the incident happened: At trial, Mr. Mora testified that he was alongside Mr. Ewing when the incident happened; at deposition, Mr. Mora testified that he was behind Mr. Ewing. (9/17 Tr. 51:16-52:17 [Mora Depo. 78].)

d.  Whether Mr. Mora was directly behind Mr. Ewing when the incident happened or off to the side at an angle: At trial, Mr. Mora testified that he was not directly behind Mr. Ewing but instead was at an angled perspective; at deposition, Mr. Mora testified he was directly behind Mr. Ewing, not at an angle. (9/17 Tr. 52:19-53:17 [Mora Depo. 79].)

e.  Whether a verbal warning was expected: At trial, Mr. Mora testified that he expected a mail handler to tell him before pulling a cage away from a lowered lift, but at deposition, when asked if he expected a mail handler to tell him when he was going

13

1    to pull a cage away from a lowered lift, Mr. Mora responded "No."  (9/17 Tr. 60:3-20
2    [Mora Depo 89].)

3    f.    Whether Mr. Ewing's truck was unloaded: At trial, Mr. Mora testified he did not
4    know if Mr. Ewing's truck was unloaded when he arrived.  At deposition, Mr. Mora
5    said Mr. Ewing's truck was unloaded.  9/17 Tr. 42:12-43:14 [Mora depo 57].

6    75.    The Court finds that the differences in Mr. Mora's trial testimony, compared to his earlier
7    sworn deposition, are material.  Mr. Mora's trial testimony regarding his physical location
8    and perspective of the incident are inconsistent with his prior deposition testimony and
9    therefore not credible.  Similarly, Mr. Mora's trial testimony regarding the two cage
10    configuration, with both cages abutting the truck bed, is not believable because it directly
11    contradicts his earlier deposition testimony.

12
13    76.    On direct and on cross, Mr. Mora described and demonstrated how Mr. Ewing lifted the
14    package up above his chest.  In his demonstration, Mr. Mora raised his arms up above his
15    head and outstretched them, as he demonstrated Mr. Ewing's act of loading the package.
16    (9/17 Tr. 54:9-25.)  Mr. Mora said he saw this from a position directly behind Mr. Ewing,
17    two feet away.  (9/17 Tr. 53:18-19, 55:7-9, 55:12-17.)  He could see Mr. Ewing's back, back
18    of his shoulders, and back of his head.  (9/17 Tr. 53:20-25.)  He testified that Mr. Ewing's
19    forearms were in contact with the cage at this moment.  (9/17 Tr. 53:10-11.)  Mr. Mora was
20    still standing directly behind Mr. Ewing when he fell.  (9/17 Tr. 56:6-8.)

21    77.    Approximately six to seven months after the incident, Mr. Ewing asked Mr. Mora to write
22    down a statement describing his recollection of the incident. (9/15 Tr. 120:16-21.)  This
23    request came after Mr. Ewing first consulted with his attorney of record, Michael Crowley.
24    (9/15 Tr. 120:22-121:2.)

25    **4.    Other Relevant Admissions By Mr. Ewing Regarding The Incident.**

26    78.    At trial, Mr. Ewing conceded that it was not physically possible for Mr. Hansen to pull the
27    cage closest to the truck that Mr. Ewing was loading a forty-pound package into if, as Mr.
28

14

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Mora testified, there were two cages on the lift in a column with one closer to the truck and

2   the other farther away.  (9/15 Tr. 121:3-16.)

3   79.   Mr. Ewing confirmed at trial that Mr. Mora's truck was not his truck to drive or unload.

4        (9/15 Tr. 121:17-23.)  He also confirmed that the mail cages were not his company's

5        property.  (9/15 Tr. 122:3-4.)  Mr. Ewing also confirmed that it was not his job responsibility

6        to tell dock workers like Mike Hansen what to do with the mail cages.  (9/15 Tr. 122:5-13.)

7   80.   Mr. Ewing agreed that he knew how to operate the hydraulic lifts, including raising the lift to

8        its "up" position, he knew how to lower the webbing side of the mail cage while it was on a

9        raised lift, and he knew this was an easier way to unload mail packages.  (9/15 Tr. 122:14-

10       123:8.)

11

12  81.   Mr. Ewing testified at trial that he understood on the day of the incident that postal workers

13       were supposed to remove cages from the lift in its lowered position.  (9/15 Tr. 123:9-12.)  He

14       knew he was responsible for looking out for his safety and avoiding unsafe actions.  (9/15 Tr.

15       123:13-16.)  Mr. Ewing did not expect to receive any verbal warning from a postal worker as

16       he was unloading Mr. Mora's truck.  (9/15 Tr. 123:17-25.)

17  **C.   Pertinent Events After the Incident Including Medical Treatment**

18       **1.   The Night of December 8-9, 2004: The Earliest History Regarding the Incident.**

19  82.   According to medical records reviewed by defense expert Kevin Harrington, M.D., the

20       ambulance was dispatched at 6:53 p.m., reached Mr. Ewing at 6:58 p.m., and departed from

21       the Clark Street facility at 7:10 p.m.  (9/30 Tr. 9:23-10:17.)

22

23  83.   The ambulance took Mr. Ewing to St. Joseph's Hospital in Eureka.  (9/15 Tr. 127:18-22.)

24       Mr. Ewing arrived at St. Joseph's at approximately 7:17 p.m., and was at St. Joseph's for the

25       next couple of hours.  (9/30 Tr. 10:18-21.)  There, Mr. Ewing was evaluated in the

26       Emergency Room by Dr. Gary Payinda.  (Def. Ex. 54.)  In the St. Joseph's medical records

27       from that night, the History of Present Illness description states that Mr. Ewing, "fell

28       backwards off the truck onto his right elbow."  (Def. Ex. A54 at 4.)

15

UNITED STATES DISTRICT COURT
For the Northern District of California

84.   Subsequently, Mr. Ewing was transported to Redwood Memorial Hospital in nearby Fortuna, California.  (9/15 Tr. 127:24-128:5.)  Mr. Ewing arrived at Redwood Memorial at approximately 10:24 p.m. on the evening of the incident and was at Redwood for the next couple of hours.  (9/30 Tr. 10:22-11:19.)  In the Redwood Memorial medical records from that night, the History of Present Illness description stated that, "He believes he landed on his outstretched hand, which took most of the force."  (Def. Ex. A54 at 5.)

85.   While at Redwood Memorial, Mr. Ewing was seen by consulting orthopedic surgeon Jack Bellah, M.D.  (9/15 Tr. 80:10-14.)  According to the medical records from Redwood Memorial, Dr. Bellah's consultation note included a Brief History: "he subsequently tripped and fell and landed on his outstretched right arm, with immediate pain and inability to use his right arm."  (Def. Ex. A54 at 6.)

86.   Later that same night, Mr. Ewing was air transported from the Eureka area to Sacramento to be evaluated at UC-Davis Medical Center.  (9/15 Tr. 128:6-10; 9/30 Tr. 11:20-13:10.)  According to the Patient Transport Record dated December 9, 2004, the medical history included "...he tripped over an object causing him to fall from a nonmoving truck bed.  To brake [sic] the fall, he extended his R hand, which he landed on, hyperextending his elbow.  There were no other complaints or injuries on exam."  (Def. Ex. A54 at. 7.)

87.   There was no indication in the medical records that Mr. Ewing was incoherent or disoriented on the night of the incident; in fact, the indication was to the contrary.  (9/30 Tr. 13:11-14.)

88.   After being transported to UC-Davis Medical Center on the night of December 8, 2004, Mr. Ewing underwent surgery for an internal reduction, open fixation of his right elbow on December 9, 2004.  (9/30 Tr. 13:15-14:10.)  The orthopedic surgeon who performed this surgery was Phillip Wolinsky, M.D.  (9/30 Tr. 30:25-31:5.)

89.   Mr. Ewing only injured his right elbow from the fall.  (9/15 Tr. 124:4-6.)  He did not injure his waist.  (9/15 Tr. 124:7-13.)  He did not injure his left arm, elbow or hand.  (9/15 Tr. 123:14-16.)

UNITED STATES DISTRICT COURT
For the Northern District of California

2. **December 2004 to August 2006: Mr. Ewing Underwent Two Surgeries and Received No Further Care From His Orthopedic Surgeons.**

90.   After the December 9, 2004 surgery, Mr. Ewing was hospitalized for three days and thereafter underwent a six-week course of physical therapy.  (9/15 Tr. 82:3-10.)

91.   Following his initial surgery, Mr. Ewing began taking prescribed narcotic pain management medications.  (9/15 Tr. 85:20-86:7.)

92.   In April 2006, Mr. Ewing underwent a second surgery, this one to remove the hardware inserted in the first surgery, and also an interpositional arthroplasty in an attempt to improve the posttraumatic arthritis.  (9/16 Tr. 176:7-25; 9/30 Tr. 14:11-15:9, 55:23-56:4.)  Karen Heiden, M.D. of UC-Davis Medical Center performed this surgery.  (9/30 Tr. 31:6-12.)

93.   On August 1, 2006, Mr. Ewing last saw his local orthopedic surgeon Jack Bellah, M.D.. (9/15 Tr. 150:2-7; Def. Ex. A52 [Ewing Depo. 19:6-7].)  At that time, Dr. Bellah told Mr. Ewing he could not provide additional help to Mr. Ewing.  (9/15 Tr. 150:12-14.)  At the same time, Dr. Bellah told Mr. Ewing he should find another doctor to help him with his pain management.  (9/15 Tr. 150:15-19.)

3. **August 2006 to March 2008**

94.   After Dr. Bellah, the next time Mr. Ewing saw an orthopedic doctor was nine months later in May 2007, at which time he was evaluated by Relton McCarroll, M.D., an upper extremity orthopedic specialist.  (9/15 Tr. 150:20-22.)  During the May 2007 office visit, Dr. McCarroll told Mr. Ewing that he may need a total elbow replacement (total elbow arthroplasty) six to ten years in the future, or a total elbow fusion, which would eliminate the elbow joint.  (9/15 Tr. 152:16-22; Def. Ex. A52 [Ewing depo 142:6-143:13]; 9/16 Tr. 178:18-179:5.)

95.   However, in May 2007, Dr. McCarroll decided to wait to intervene surgically until either Mr. Ewing's range of motion significantly deteriorated or until his pain became problematic. (9/16 Tr. 178:18-180:24, 232:6-9.)  Dr. McCarroll understood that as of May 2007, Mr. Ewing's pain level had stabilized and, as a result, Dr. McCarroll told Mr. Ewing that if his

17

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    pain level changed, causing him to increase his pain medication, he might change his

2    recommendation.  (9/16 Tr. 232:10-18.)

3   96.    During the time after he stopped seeing Dr. Bellah in August 2006, Mr. Ewing was seen 5-6

4         times by Luarence Badgley, M.D., who assisted Mr. Ewing with pain management.  (9/16 Tr.

5         161:4-16; Exh. A52 [Ewing depo 17:17-18:21].)  In March 2008, Mr. Ewing saw Lei Han,

6         M.D., who referred Mr. Ewing back to Dr. McCarroll.  (9/15 Tr. 151:25-152:5, 160:12-18.)

7         **4.     Events After March 2008:**

8
9   97.    On April 14, 2008, Mr. Ewing saw Dr. McCarroll and reported to him that his pain level had

10        intensified since January 2008.  (9/15 Tr. 153:22-25; 9/16 Tr. 181:7-10.)  At that time,

11        however, Mr. Ewing did not tell Dr. McCarroll that he had applied to 10-15 employers from

12        January to March 2008, or that he was prepared to work at any time on any shift in any

13        position for those employers.  (9/15 Tr. 154:17-25.)

14  98.    Dr. McCarroll noted that Mr. Ewing's pain had increased and that he was taking significantly

15        higher doses of pain medication for pain control.  (9/16 Tr. 181:11-17.)  Additionally, Dr.

16        McCarroll found evidence that Mr. Ewing's elbow structure was continuing to deteriorate.

17        (9/16 Tr. 182:16-18.)  Taking these factors together, Dr. McCarroll determined that surgical

18        intervention was necessary; specifically, either an elbow fusion or a total elbow arthroplasty.

19        (9/16 Tr. 182:19-183:2.)

20  99.    On June 26, 2008, Dr. McCarroll performed a total elbow arthroplasty on Mr. Ewing.  (9/15

21        Tr. 86:12-22.)

22        **5.     Other Medical Evidence:  Dr. Kevin Harrington's December 2007 Examination**
23        **of Mr. Ewing.**

24  100.   Defense medical expert Kevin Harrington, M.D., an orthopedic surgeon, examined plaintiff

25        on December 14, 2007.  During that examination, Mr. Ewing told Dr. Harrington he was all

26        but unable to use his right arm due to the injury to his elbow in December 2004.  (Tr. 9/30

27        Tr. 18:21-23.)

28

101. Mr. Ewing told Dr. Harrington he was taking a maximum of 4 Norco tablets per day and that his pain was at a level of 6-8 out of 10.  (Tr. 9/30 Tr. 18:11-20.)

102. Dr. Harrington measured Mr. Ewing's elbow flexion as reaching 100 degrees of flexion. (9/30 Tr. 19:21-20:12.)

103. Dr. Harrington measured Mr. Ewing's muscle mass in his upper extremities, at the midpoint of the forearm and at the upper arm, and he found that Mr. Ewing had a slight atrophy, measured at 4% loss, on the right side when compared to the left.  (9/30 Tr. 24:22-27:9.)

104. According to Dr. Harrington, based on his examination, Mr. Ewing had functional use of his right elbow because he could achieve up to 110 degrees of flexion by using his elbow, wrist, shoulder and spine in combination to bring his right hand to his mouth to feed himself.  (9/30 Tr. 20:13-21:10.)

105. Dr. Harrington also found no synovitis, or inflammation, in the injured right elbow.  (9/30 Tr. 30:13-15.)

106. When examined by Dr. Harrington, Mr. Ewing had normal neurological function, along with no significant atrophy, good strength, good dexterity, and an acceptable range of motion. (9/30 Tr. 30:19, 40:6-13.)

**D.     Plaintiff's Medical Bills Have Been Paid By State Compensation Insurance Fund.**

107. DM Transportation's workers compensation insurer, State Compensation Insurance Fund ("SCIF"), paid for all medical treatment received by Mr. Ewing after the December 2004 incident.  (9/15 Tr. 138:21-139:3.)

108. The parties stipulated that State Compensation Insurance Fund had paid $52,520.83 to health care providers on Mr. Ewing's behalf for medical expenses incurred from December 8, 2004 up until the date trial commenced.  (Dkt. #71, Revised Trial Stipulations, ¶ 7.)

109. Mr. Ewing has never seen any of the bills for his medical expenses or made any payments towards the charges associated with this medical treatment.  (9/15 Tr. 138:21-139:3; Def. Ex.

19

1    A52 [Ewing Depo 141:5-25].)

2  **E.      Plaintiff's Work History After the Incident.**

3  110.   Mr. Ewing has not worked for DM Transportation or any other employer since the day of the

4         incident; in fact, he did not search for any other employment for more than three years after

5         the incident.  (9/15 Tr. 148:12-14.)

6

7  111.   Mr. Ewing testified that from January to March 2008, he applied for approximately 15

8         employment positions at restaurants, pizza parlors, gas stations, and Starbucks.  (9/15 Tr.

9         87:25-88:9.)  In those job applications, Mr. Ewing said he could start work immediately and

10        would take any shift, on any day of the week, in any position.  (9/15 Tr. 140:15-141:3.)

11 **F.      Mr. Ewing's Loss of Household Services.**

12 112.   Mr. Ewing's claims include a claim for loss of household services he can no longer provide

13        due to his elbow injury.

14 113.   Mr. Ewing testified that during the 20 months before the incident, he worked 11 or 12 out of

15        every 14 days and on those workdays he was home no more than 8 hours, with the rest of his

16        time taken up working 15 hour split shifts for DM Transportation.  (9/15 Tr. 141:4-25.)

17 114.   Mr. Ewing's wife, Lori, has been disabled for the past 12 years.  (9/15 Tr. 142:13-16.)  The

18        State of California provides in-home care and support.  (9/15 Tr. 142:19-22.)  The in-home

19        care person has been coming to the Ewing home for the past 12 years.  (9/15 Tr. 142:22-24.)

20        Mr. Ewing testified at trial that the in-home care has only been for his wife's medical needs.

21        (9/15 Tr. 142:25-143:3.)

22 115.   In an earlier statement, however, Mr. Ewing said "No.  She has a worker," in response to the

23        question: "Do you have to assist her much?"  (9/15 Tr. 144:20-21, Def. Ex. A34 at 3:20-21.)

24 **G.      Plaintiff's Damages Claims.**

25 116.   Mr. Ewing seeks the following damages:

26        a.      Medical Expenses: Mr. Ewing seeks $327,902.61 for medical expenses.  (Dkt. #52 at

20

UNITED STATES DISTRICT COURT
For the Northern District of California

7.)

b.    Lost Wages: Mr. Ewing seeks $644,766 for loss of wages, past and future.  (*Id*. at  8.)

c.    Lost Household Services: Mr. Ewing seeks $254,267 for loss of household services, past and future.  (*Id.*. at 8.)

d.    General Damages: Mr. Ewing seeks up to $2 million in general damages.  (Dkt. #53 at 4, ¶40.)

## III.   CONCLUSIONS OF LAW

### A.    Jurisdiction

1.    The Court has exclusive jurisdiction over this matter under the Federal Tort Claims Act, 28 U.S.C. § 1346(b).  To have a cognizable claim under the Federal Tort Claims Act, the claim must arise from the negligent or wrongful act of a government employee acting within the scope of his employment under circumstances where the United States, if it were a private individual, would be liable under the law of the state where the claim arose.  28 U.S.C. §§ 1346(b), 2674.

2.    Because the incident giving rise to Mr. Ewing's claim arose in California, the Court applies California substantive law.  *Delta Sav. Bank v. U.S.*, 265 F.3d 1017, 1025 (9th Cir. 2001).

### B.    Legal Standard - Negligence

3.    "In order to establish negligence under California law, a plaintiff must establish four required elements: (1) duty; (2) breach; (3) causation; and (4) damages."  *Ileto v. Glock Inc.*, 349 F.3d 1191, 1203 (9th Cir. 2003); *see McGarry v. Sax*, 158 Cal. App. 4th 983, 994 (2008).

4.    In California, plaintiffs have the burden of proving each of these elements by a preponderance of the evidence.  *Management Activities, Inc. v. U.S.*, 21 F. Supp. 2d 1157, 1174 (C.D. Cal. 1998) (citing Cal. Civil Jury Instruction (BAJI) 2.60.)

5.    "The existence of a legal duty to use reasonable care in a particular factual situation is a question of law for the court to decide."  *Vasquez v. Residential Inv., Inc.*, 118 Cal. App. 4th

21

269, 279 (2008).  "However, the elements of breach of that duty and causation are ordinarily questions of fact for the jury's determination."  *Id.*

6.  "The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion."  *Laabs v. S. Cal. Edison Co.*, 175 Cal. App. 4th 1260, 1271 (2009) (citing *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 397 (1992).)

7.  "As a general rule, each person has a duty to use ordinary care and 'is liable for injuries caused by his failure to exercise reasonable care in the circumstances[.]'"  *Id.* (quoting *Rowland v. Christian*, 69 Cal. 2d 108, 119 (1968)).

8.  California courts have invoked the concept of duty to limit the potentially infinite liability that would flow from every negligent act.  *Bily*, 3 Cal. 4th at 397.  Accordingly, "[d]uty is merely a conclusory expression used when the sum total of policy considerations lead a court to say that the particular plaintiff is entitled to protection."  *Carrera v. Maurice J. Sopp & Son*, 177 Cal. App. 4th 366, 377 (2009) (quoting *Armato v. Baten*, 71 Cal. App. 4th 885, 893 (1999) (internal quotation omitted)).  To determine whether a duty exists, courts must balance various policy considerations, including, "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community in imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved."  *Rowland*, 69 Cal. 2d at 113; *see also Laabs*, 175 Cal. App. 4th at 1272.  The foreseeability of harm, while not determinative, is the chief factor in the duty analysis.  *Scott v. Chevron U.S.A.*, 5 Cal. App. 4th 510, 515 (1992).

9.  With respect to causation, Mr. Ewing must show that the United States' conduct was the probable, not merely a possible, cause of his injury.  *See Hiller v. United States*, No. C 05-

22

1620 SBA, 2007 WL 3355106, at *31 (N.D. Cal. Sept. 28, 2007).

10.   Causation must be founded upon expert testimony, not inferred from the trier of fact's consideration of the totality of the circumstances, *unless* those circumstances include the requisite expert testimony on causation.  *Cottle v. Superior Court*, 3 Cal. App. 4th 1367, 1385 (1992).

11.   Regarding damages, Mr. Ewing bears the burden of proving by a preponderance of the evidence each item of damages sought at trial.  *See* Ninth Circuit Model Jury Instruction 7.1.

12.   This case involves principally claims of future damages.  Under California law, future damages that are speculative should not be awarded.  Cal. Civ. Code § 3283 ("Damages may be awarded, in a judicial proceeding, for detriment resulting after the commencement thereof, or certain to result in the future."); *Piscitelli v. Friedenberg*, 87 Cal. App. 4th 953, 989 (2001) (Damages cannot be speculative, and are limited to those that are "reasonably certain to have been realized but for the wrongful act of the opposing party."); *Mozzetti v. City of Brisbane*, 67 Cal. App. 3d 565, 577 (1977) ("It is black-letter law that damages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for recovery").

13.   Mr. Ewing had a duty to mitigate his damages and cannot recover losses he could have avoided through reasonable efforts.  *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1568 (1996) ("A plaintiff has a duty to mitigate damages and cannot recover losses [he] could have avoided through reasonable efforts."); *Shaffer v. Debbas*, 17 Cal. App. 4th 33, 41 (1993) (a plaintiff who suffers damage as a result of a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses that could have been avoided).

14.   With respect to witnesses testimony, the trier of fact may believe everything a witness says, or part of it, or none of it.  In considering the testimony of any witness, the trier of fact may take into account:

23

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case and any bias or prejudice;

(5) whether other evidence contradicted the witness's testimony;

(6) the reasonableness of the witness's testimony in light of all the evidence; and

(7) any other factors that bear on believability.

*See Hiller*, 2007 WL3355106, at *32; Ninth Circuit Model Jury Instruction 3.6. The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. *Id.*

15.  Opinion testimony should be judged like any other testimony. The trier of fact may accept it or reject it, and give it as much weight as it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case. Ninth Circuit Model Jury Instruction 3.7.

**C.  Mr. Ewing Failed to Establish Negligence By a Preponderance of the Evidence Under Any of His Theories**

**1.   Mr. Ewing's Own Account of the Incident Is Implausible**

16.  Mr. Ewing testified that there were four cages on the lift at lift number three in a configuration of two rows of two cages. He testified that Mike Hansen pulled away the cage closest to the truck's bed on Mr. Ewing's right hand side while he was unloading a 40 pound package into the cage, thereby causing him to fall. (9/15 Tr. 108:11-13, 109:1; Def. Ex. A52 [Ewing Depo 91:1-14, 93:14-18].)

17.  At trial, Mr. Ewing confirmed that the configuration of the cages did not change. (9/15 Tr. 114:14-25; Def. Ex. A52 [Ewing Depo 96:7-19].)

18.  Mr. Ewing acknowledged that a maximum of four mail cages can fit on the hydraulic lifts. (Def. Ex. A52 [Ewing Depo 96:7-19]; 9/18 Tr. 33:8-22.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

24

UNITED STATES DISTRICT COURT
For the Northern District of California

19.   When cages are aligned in pairs on the lifts, and in the formation described by Mr. Ewing, a cage cannot be pulled off the lift in a sideways direction due to the lack of clearance between the side railings.  (9/18 Tr. 33:2-34:19.)

20.   Defense expert biomechanical specialist Rajeev Kelkar, Ph.D., testified that it is geometrically impossible for a person in Mr. Hansen's physical location to pull the cage closest to the truck bed off the lift, as described by Mr. Ewing, if there are four cages in a two by two configuration, as also described by Mr. Ewing.  (9/18 Tr. 41:6-42:15.)

21.   Mr. Ewing acknowledged that it was not possible for Mr. Hansen to pull the cage off the lift, as Mr. Ewing described, if there were four cages on the lift in a two by two configuration, as he also described.  (9/15 Tr. 115:1-116:2.)

22.   Taking the foregoing evidence into consideration, the Court finds that Mr. Ewing's account of how the incident occurred is improbable.  As indicated, Mr. Ewing himself conceded that if the number and configuration of cages were as he recalls, it was not possible for Mr. Hansen to pull the cage nearest to Mr. Ewing away.  Dr. Kelkar confirmed this during his testimony.  Accordingly, the Court finds that Mr. Ewing's testimony failed to establish by a preponderance of the evidence that Mr. Hansen caused Mr. Ewing's injury.

**2.      Mr. Ewing's Description of His Body's Position On Lift Three Is Not Probable**

23.   Further, Mr. Ewing's testimony about the location of the fall is not probable given his description of his body positioning after the fall.

24.   Mr. Ewing testified that the incident occurred at dock lift number three.  (9/15 Tr. 69:23-25, 157:20-23.)  Mr. Mora agreed with Mr. Ewing on this point.  (9/17 Tr. 14:24-15:1, 17:1-3, 17:10-15, 18:1-14, 25:1-2.)

25.   According to Mr. Ewing's testimony concerning his body position after the incident, his waist was draped over the top edge of the dock flaps in their raised position (9/15 Tr. 96:21-24, 125:7-126:21), his legs were under the bed of Mr. Mora's truck (9/15 Tr. 96:13-18, 118:12-23; Def. Ex. A52 [Ewing Depo 117:20-118:24]), and his body was "dangling" and

25

UNITED STATES DISTRICT COURT
For the Northern District of California

1

2

"bouncing" in this position (9/15 Tr. 118:24-119:21; Def. Ex. A52 [Ewing Depo 117:20-118:24]).

3

4

26.   He confirmed that his "X" on a photo exhibit was meant to indicate where his waist made contact with the top of the flap.  (9/15 Tr. 125:7-126:21; Ex. A7.)

5

6

27.   The Court finds Mr. Ewing's and Mr. Mora's testimony that the incident occurred at lift number three improbable for two reasons.

7

8

9

10

11

12

13

14

15

16

17

28.   First, the dock flap at lift number three is lower than the bed of the truck.  (9/17 Tr. 49:5-8.) Mr. Ewing confirmed this at trial when he estimated the lift flap at lift number three is one foot lower than the truck bed.  (9/15 Tr. 119:22-120:10.)  The photographic evidence showed that the top of the lift flap at lift number three was 46 inches above the elevation of the trucks' parking level, which is less than the contractually-required minimum of 48 inches of elevation for Mr. Mora's truck bed.  (9/18 Tr. 29:8-21, Def. Ex. A30 - DSC_0149; 9/17 Tr. 38:12-39:25.)  Therefore, it is improbable that Mr. Ewing ended up with his waist over the raised lift flap at lift number three as he described because it is impossible for Mr. Ewing's waist to interact with the lift flap at that location.  (9/18 Tr. 15:14-25, 49:1-24; Def. Ex. A30 - DSC_0257, 270, 277.)

18

19

20

21

29.   Second, the dock flap at lift number three abuts against the edge of the lift platform.  (Def. Ex. A30 - DSC_0270, 277.)  Therefore, it is impossible for Mr. Ewing to end up with his legs under Mr. Mora's truck at lift number three as he described because it is impossible for Mr. Ewing's legs to extend below the truck bed at that location, due to the lack of clearance.

22

23

30.   Taking the foregoing into consideration, the Court further finds that it is improbable that the incident occurred at lift three.

24

25

**3.   Mr. Mora's Trial Testimony Was Not Credible.**

26

27

28

31.   Mr. Mora's trial testimony describing the incident varied significantly from Mr. Ewing's and, as noted in Findings of Fact ¶74, contradicted his earlier deposition testimony on several critical points.

26

UNITED STATES DISTRICT COURT
For the Northern District of California

32.    Most notably, in contrast to Mr. Ewing's testimony that there were four cages on the lift, Mr. Mora testified that there were two mail cages on the lift, arranged in a row next to the truck bed. (9/17 Tr. 17:16-18:16.)  With respect to the exact configuration of the cages, when the Court asked him to clarify this point, Mr. Mora stated that both cages were abutting the truck bed. (9/17 Tr. 18:17-20.)  This trial testimony contradicted Mr. Mora's earlier sworn deposition testimony, where he stated that Mr. Ewing was loading a package into the cage "closest" to the truck when the incident happened. (9/17 Tr. 46:2-49:17 & 49:18-50:6.)

33.    Additionally, Mr. Mora testified at trial that he could see the incident because he was off to the side of Mr. Ewing in the back of the truck bed. (9/17 Tr. 51:16-20, 52:22-53:3.)  However, at his deposition Mr. Mora testified he was directly behind Mr. Ewing, not off to the side at an angle. (9/17 Tr. 51:16-53:25.)

34.    In addition, Mr. Mora's description and demonstration of how Mr. Ewing's arms moved just before the incident, with his hands raised and extended above his head, while holding a heavy package of cheese, makes it highly unlikely, if not impossible, for Mr. Mora to have seen anything taking place in front of Mr. Ewing. (9/17 Tr. 54:9-25, 53:18-19, 55:7-9, 55:12-17.)

35.    Mr. Mora also testified at trial to several facts that contradicted his earlier sworn deposition testimony.  For example, Mr. Mora testified at trial that he expected a verbal warning from postal mail handlers when they were removing a mail cage from a lift in the lowered position, but at his deposition Mr. Mora said he did not expect such a warning. (9/17 Tr. 60:3-20.)  Mr. Mora also testified that he wrote a statement about the incident because Mr. Ewing requested it and he denied that Mr. Ewing's attorney asked him to do it.  However, at his deposition, Mr. Mora testified that Mr. Crowley's office got ahold of him and asked him to write his statement. (9/17 Tr. 56:25-57:23.)

36.    Further, Mr. Mora was insistent that the location of the incident was dock lift number three. (9/17 Tr. 14:24-15:1, 17:1-3, 17:10-15, 18:1-14, 25:1-2.)  However, as set forth herein, it was

27

1    impossible for the incident to have occurred at lift number three, thereby undermining Mr.

2    Mora's testimony.

3    37.    Based on the foregoing, the Court finds that Mr. Mora's testimony is entitled to little weight.

4    The Court also concludes that plaintiff failed to carry his burden of proof based on Mr.

5    Mora's testimony.

6    **4.      Mr. Hansen's Testimony Did Not Establish Any Negligence.**

7

8    38.    Mr. Hansen testified that he was "very certain" there were only two cages on the lift.  (9/15

9    Tr. 16:15-18, 25:7-12.)

10   39.    Mr. Hansen kept an eye on Mr. Ewing and Mr. Mora while they were unloading packages

11   into the cages and the level of parcels in the cage while he continued his work of breaking

12   out mail on the dock.  (9/15 Tr. 17:11-23.)

13   40.    When the cage was full, Mr. Hansen was able to see that it was full through the webbing

14   side, and so he pulled it backward away from the truck bed.  (9/15 Tr. 17:24-19:6, 42:2-15.)

15   41.    Although Mr. Hansen could not see Mr. Ewing from behind the cage, Mr. Hansen testified

16   that, as he pulled the cage back, he felt no resistance, such as from a body in contact with the

17   cage unloading a package, as Mr. Ewing claimed in his testimony.  (9/15 Tr. 18:4-11, 19:7-

18   10, 20:20-23, 26:6-14, 27:19-24, 28:20-23, 29:2-5.)

19

20   42.    Mr. Hansen testified that he had pulled the cage away from the immediate area, off the lift,

21   and was turning it, when he heard a loud crash sound.  (9/15 Tr. 22:5-14, 41:9-42:1, 46:24-

22   47:18, 47:25-48:19, 49:2-24.)

23   43.    The length of the lift surface was eight feet in length.  (9/15 Tr. 41:23-42:1, 50:5-7.)

24   44.    Therefore, based on Mr. Hansen's testimony, Mr. Hansen was at least eight feet from Mr.

25   Ewing when Mr. Ewing fell off the truck.

26   45.    Based on Mr. Ewing's testimony of how his body was draped over the top edge of the lift

27   flap, and the evidence regarding the dimensions of lift number two being recessed 24 inches

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

28

from the truck bed, the Court concludes that the incident occurred at lift number two and therefore Mr. Hansen was 8-10 feet from Mr. Ewing at the time that he fell off the truck.

46.   If Mr. Hansen was 8-10 feet from Mr. Ewing at the time Mr. Ewing fell, then Mr. Ewing's arms were not extended into the cage and his body was not draped over the side of the cage unloading a package, as he claimed.

47.   Therefore, because the preponderance of evidence establishes a lack of any factual nexus between Mr. Hansen's actions and the incident, Mr. Ewing failed to carry his burden of proof to show negligence based on Mr. Hansen's testimony.

**5.     Mr. Ewing's Claim Based On An Absence of Verbal Warning Failed For Lack of Evidence.**

48.   Mr. Ewing claimed that Mr. Hansen was negligent because Mr. Hansen failed to give a verbal warning before pulling the mail cage off the lift.  Mr. Ewing's argument fails for two reasons.

49.   First, the evidence established that the act of moving the cages off the lift provides an audible warning when the cage's wheels move over a pattern of raised edges on the lift platform. (9/15 Tr. 39:18-41:1.)

50.   Second, there was no expectation on the part of the dock workers or contractors that a verbal warning would be provided.

51.   Mr. Hansen testified that there was no verbal warning expected or given on the dock before a postal worker was going to remove a mail cage from a lift in the lowered position.  (9/15 Tr. 31:9-17, 43:25-44:17.)

52.   Mr. Ewing also conceded that Mr. Hansen's testimony was correct, namely that he did not expect a verbal warning before a mail handler was going to move a mail cage off a lowered lift.  (9/15 Tr. 123:17-25.)

53.   Mr. Mora testified at trial that he did expect such a warning, but at his earlier sworn

UNITED STATES DISTRICT COURT
For the Northern District of California

deposition he agreed with Mr. Hansen and Mr. Ewing.  (9/17 Tr. 60:3-20.)

54.   Based on the foregoing, the Court concludes that Mr. Ewing failed to carry his burden of proof to show that Mr. Hansen breached his duty of due care by not providing Mr. Ewing with a verbal warning before removing the mail cage from the lift.

**6.   Plaintiff's Loss of "Passive Resistance" Claim Failed For Lack of Evidence.**

55.   One of Mr. Ewing's theories is that when Mr. Hansen removed a cage from the lift, it eliminated the passive resistance that was keeping the cage he was loading in place, allowing it to move as he leaned into it and causing him to fall forward.  Based on the evidence adduced at trial, the Court finds this theory improbable for several reasons.

56.   First, this claim is improbable because it depends on two rows of cages, one closer to the truck and one farther from the truck.  Both Mr. Hansen and Mr. Mora testified that there were only two cages on the lift.  While Mr. Ewing testified that there were four cages on the lift, he also claimed that Mr. Hansen pulled away the cage into which he was unloading a package.  (Def. Ex. A23-0018 [Response to question 8]); *see also* Compl. ¶ 3].)

57.   Mr. Hansen's testimony could not support the loss of passive resistance theory because according to him, he pulled a cage away from the end of the lift, next to the truck, and when he was 8-10 feet away, he heard a loud crash caused by Mr. Ewing falling into the space where the cage had been.  Thus, there was no cage being held in place by the cage he pulled away.

58.   Moreover, the claim of passive resistance is one that must be made through expert witness testimony because it involves knowledge and expertise beyond the average layperson.  *Jones v. United States*, 933 F. Supp. 894, 900 (N.D. Cal. 1996) (citations omitted).  Causation must be founded upon expert testimony, not inferred from the trier of fact's consideration of the totality of the circumstances, unless those circumstances include the requisite expert testimony on causation.  *See Cottle,* 3 Cal. App.4th at 1385.

30

UNITED STATES DISTRICT COURT
For the Northern District of California

59.    Mr. Ewing listed, but did not call, expert Bahram Ravani. Ph.D., as a trial witness (Dkt. #51, at 3).  Mr. Ewing tried to press this theory through defense expert Dr. Kelkar, who explained that if he disregarded Mr. Hansen's testimony about the cages' configuration, then passive resistance was a possible explanation for the incident, as described by Mr. Ewing and Mr. Mora.  (9/17 Tr. 45:1-46:14, 62:23-64:5.)  However, Dr. Kelkar's testimony accepts as true Mr. Ewing's and Mr. Mora's testimony.  As stated herein, the Court finds that their testimony is not credible on several key points.  Consequently, Dr. Kelkar's opinion, which rests on their testimony, is entitled to little weight.

60.    For the foregoing reasons, the Court concludes that Mr. Ewing failed to prove his lack of passive resistance claim by a preponderance of the evidence.

**D.     The United States Proved That Mr. Ewing Tripped Or Fell Backwards Out Of Mr. Mora's Truck At Lift Number Two, Thereby Disproving Mr. Ewing's Case.**

**1.      The Only Possible Location of the Incident Is Lift Number Two.**

61.    Unlike dock lift number three, the dimensions and configuration of dock lift number two fit with Mr. Ewing's description of his body's position after the incident.

62.    First, the lift flaps at lift number two extend more than 12 inches higher above the truck bed than the lifts at bay number three when the lift is in the lowered position.  (9/18 Tr. 20:6-16.)  Therefore, it is only possible for Mr. Ewing's waist to make contact with the lift flap as he described at lift number two.  (9/18 Tr. 49:2-50:15.)

63.    Second, the lift is recessed from the edge of the lift platform by approximately 24 inches.  Therefore, it is possible for Mr. Ewing's legs to fit underneath the truck bed, within the 24 inch clearance.  (9/18 Tr. 21:6-23:25, 51:15-52:10.)

64.    The preponderance of the evidence supports the United States' contention that Mr. Ewing fell or tripped out of the back of Mr. Mora's truck at lift number two.

**2.      A Tripping or Falling Backwards Incident Is Consistent With The Earliest Descriptions Of The Incident In The Medical Records.**

31

65. Mr. Ewing's ER record from St. Joseph's Hospital, created within three hours of the incident, states that "he fell backwards off the truck onto his right elbow." (Def. Ex. A54, p. 4.)

66. A similar description appears in a record created later that night at Redwood Memorial Hospital: "He believes he landed on his outstretched hand, which took most of the force." (Def. Ex. A54, p. 5.)

67. While still at Redwood, Mr. Ewing received a consultation from Dr. Bellah, who noted "he subsequently tripped and fell and landed on his outstretched right arm, with immediate pain and inability to use his right arm." (Def. Ex. A54 at 6.)

68. Finally, the air transportation records document a tripping incident: "he tripped over an object causing him to fall from a nonmoving truck bed. To brake [sic] the fall, he extended his R hand, which he landed on, hyper-extending his elbow. There were no other complaints or injuries on exam." (Def. Ex. A54, p. 7.)

69. Thus, the descriptions in Mr. Ewing's medical records weigh against his assertion that it was Mr. Hansen's act of pulling away a cage that caused him to fall. Rather, the descriptions set forth above militate in favor of a finding that Mr. Ewing tripped or fell while in the bed of Mr. Mora's truck, and not as a result of the moving of the mail cage.

**3.    A Tripping or Falling Backwards Incident Is Consistent With The Evidence Regarding Mechanism of Injury.**

70. The tripping or falling scenario is also consistent with the mechanism of injury. Dr. McCarroll testified that a fall on an outstretched hand is consistent with the injuries Mr. Ewing received. (9/16 Tr. 218:20-220:1, 248:14-21.)

71. Dr. Harrington concurred on this point. (9/30 Tr. 33:17-34:9.)

**4.    A Tripping or Falling Backwards Incident Is Consistent With The Expert Biomechanical Testimony.**

72. The tripping or falling scenario is also consistent with the biomechanical testimony of

32

defense expert Dr. Kelkar, who explained that, for Mr. Ewing's waist to interact with the top edge of the metal flaps, he had to fall from a point inside his truck approximately equal to the length of his lower extremities, which he estimated at three feet.  (9/18 Tr. 53:1-23.)

73.     Because the lift flap at lift number two is recessed from the edge of the dock platform by 24 inches, based on Dr. Kelkar's testimony, Mr. Ewing's trip or fall started at a point approximately one foot inside the truck bed.  (9/18 Tr. 21:4-17.)

### IV.   CONCLUSION

In sum, the Court concludes that Mr. Ewing failed to prove by a preponderance of the evidence that his injury was the result of negligence.  Accordingly, the Court **ENTERS JUDGMENT** in favor of Defendant United States.

**IT IS SO ORDERED.**

Dated: September 30, 2009

_____
Maria-Elena James
Chief United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
For the Northern District of California

33